## IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
### DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 32507-5-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JOHNATHON MICHAEL FLORES, | ) | OPINION PUBLISHED IN PART |
| | ) | |
| Appellant. | ) | |

KORSMO, J. — Johnathon Flores appeals his convictions for first degree assault and first degree robbery, primarily arguing that he was constructively denied counsel because his appointed attorney did not have the requisite experience under the standards for indigent defense (SID). We conclude in the published portion of this opinion that a violation of the SID is evidence of deficient performance to be considered in assessing an ineffective assistance of counsel challenge and does not constitute a denial of counsel. In the unpublished portion, we conclude that trial counsel's performance, while deficient, was not ineffective. The convictions are affirmed.

### FACTS

Mr. Flores, his half-brother Jesse Flores, and his half-sister Faith Flores, confronted Jeffrey Weitman in the home of Sandra McCorkle in Omak on May 16,

2013.[1] Weitman, age 34, had been dating McCorkle, age 63, for a decade. The previous day, Faith Flores had gotten into an altercation with Weitman at the residence of her friend McCorkle over the belief that Weitman was contacting another woman via Facebook. Faith telephoned her brother Johnathon in Spokane, and had the two men speak. Johnathon told Weitman, a former high school classmate, that he would be coming to talk to him.

Despite being restricted to staying in Spokane County by the terms of an earlier judgment and sentence, Johnathon traveled to Omak to assist in dealing with Weitman. On the 16th, Weitman called McCorkle and received permission to borrow some lawn equipment. He drove to the house, entered it, and proceeded to the kitchen. There he was confronted by the three Flores siblings.

Jesse Flores was armed with a knife that he displayed at some point early in the encounter. The three Flores family members demanded that Weitman empty his pockets in order to discover and return any items stolen from McCorkle. Weitman put his wallet, $80, keys, and an MP3 player in a basket near the door. Faith Flores then escorted Ms. McCorkle to another room. At some point thereafter, an altercation took place and Jesse Flores stabbed Weitman. The three Flores siblings fled, splitting up briefly before

---

[1] Jesse Flores and Faith Flores are not related to each other, but both are half-siblings to Johnathon Flores. Johnathon and Faith share the same mother, while Jesse and Johnathon share the same father. Because all three share the same surname, we will occasionally refer to them by first name for purposes of clarity.

2

meeting together later. They took the $80; Weitman's keys ended up in the freezer and his cell phone on the floor by the door.

All three were eventually charged in Okanogan County Superior Court with varying robbery and assault charges. Jesse Flores pleaded guilty, while Faith Flores reached a plea deal that required her to testify against her brother. Johnathon, charged with first degree robbery and first degree assault, both alleged to have been committed with a deadly weapon, elected to take his case to trial. The trial court appointed the Okanogan County contract indigent defender to represent Johnathon Flores. The law office of MacDougall & Prince held the indigent defender contract for the county. Clerk's Papers (CP) at 156. That office soon thereafter assigned Emma Paulsen to represent Johnathon Flores. She filed a notice of appearance dated June 6, 2013. CP at 155.

Ms. Paulsen represented Johnathon Flores until withdrawing five months later. When Ms. Paulsen withdrew, Mubarak Raheem substituted as counsel for Johnathon Flores. CP at 154. The contact address Mr. Raheem filed with the court was different than that of the MacDougall firm. CP at 154, 156. During the litigation, Mr. Raheem filed documents with the court on pleading paper bearing his office's name and address, as well as on pleading paper from the MacDougall & Prince firm.

Mr. Raheem provided the sole representation for Mr. Flores in front of the jury. Faith Flores testified for the prosecution, as did Mr. Weitman, Ms. McCorkle, and several law enforcement officers. Jesse Flores was the sole witness to testify for the defense.

3

Weitman testified that he was assaulted by the two Flores brothers and was stabbed by Jesse. Defense counsel questioned Weitman about his telephone conversation with Johnathon, confirming that Johnathon had been calm and had not threatened him. Cross-examination also developed that Weitman weighed around 350 pounds and was five inches taller and more than 200 pounds heavier than Jesse. Weitman was not asked about his statement to a defense investigator or whether he had conversations with Johnathon Flores' wife.

Faith Flores testified that she called both of the brothers and asked for their help with Weitman. Although she did not tell them what to do, she wanted them to beat Weitman up for disrespecting her and also regain checks belonging to McCorkle. She had McCorkle tell Weitman that the Flores siblings were not present, and then the three of them hid in the house in anticipation of Weitman's arrival. Defense counsel impeached Faith with the terms of her plea agreement that called for her to spend 25 months in prison for robbery. She also admitted that she had planned to take Weitman's car.

McCorkle testified that she witnessed the three Flores siblings corner Weitman in the kitchen. Faith walked her out of the kitchen after Jesse had stepped on McCorkle's foot, causing her pain. She had not wanted anyone to get hurt, but knew something had happened by the sound of breaking glass.

The defense called Jesse Flores to testify. He admitted responsibility for stabbing Weitman and denied that the others had known or expected that he would do so. He also

4

claimed responsibility for taking Weitman's property. He told the jury that Johnathon had only come to talk to Weitman and was not involved in the altercation or theft. The stabbing occurred when Weitman tried to escape by fighting his way past Jesse.

Defense counsel then sought to call the defense investigator concerning his interview with Weitman. The trial court sustained the prosecutor's objection to calling the witness on the basis that no foundation had been established to impeach Weitman since he had never been asked about the interview. A similar objection was sustained concerning any testimony from Michaela Flores, the defendant's wife, about conversations between her and Weitman. Defense counsel then sought to recall Weitman to the stand to set a foundation for impeaching him. The trial court again sustained the prosecutor's objection, noting that Weitman had been excused and had not been on the defense witness list.

In closing argument, the defense argued that Johnathon was an innocent bystander who had only traveled to Okanogan to talk to Weitman about the way he treated Faith Flores. Ms. Flores, the chief instigator of the confrontation, had been pursuing her own agenda and had not recruited Jonathon for criminal activity. The jury did not accept the argument and, instead, found Johnathon Flores guilty of both crimes and the accompanying deadly weapon allegations.

Mr. Raheem filed a motion for a new trial, focusing on alleged juror misconduct, late disclosure of evidence, and the court's refusal to recall Weitman to the stand. Ms.

5

MacDougall appeared with Mr. Raheem for the post-trial hearings and argued the new

trial motion. The court stood by its original ruling concerning Weitman's testimony and

the court denied the motion.

Mr. Raheem represented Mr. Flores at sentencing. The court imposed concurrent

standard range sentences. Mr. Flores then timely appealed to this court. Subsequently,

Mr. Raheem's qualifications to try this case were put at issue. In an affidavit, he alleged

that he was not qualified because, while he had tried three felony cases to a jury, he did

not have sufficient practice experience.[2] The appellate record was also supplemented

with his certifications of SID compliance during the 2013 calendar year.

We granted the motion of The Defender Initiative to file an amicus curiae brief. A

panel subsequently heard oral argument.

## ANALYSIS

As indicated previously, the sole issue we consider in the published portion of this

opinion is a contention, raised both by Mr. Flores and the amicus, that appellant was

constructively denied his constitutional right to counsel because Mr. Raheem did not

satisfy the requirements of the SID at the time of trial. We consider the ineffective

---

[2] At the time of appointment, Mr. Raheem had been admitted to the bar for more than two years. While the affidavit does not explain why he did not satisfy the time of practice requirement, appellate counsel clarified at argument that Mr. Raheem did not practice law during that entire period.

assistance argument and challenges to the sentence in the unpublished portion of this

opinion.

The SID were adopted effective October 1, 2012. With one notable exception, the

standards at issue here were part of that original adoption. Standard 14 deals with the

qualifications of attorneys. Standard 14.1 provides:

> *Standard 14.1.* In order to assure that indigent accused receive the
> effective assistance of counsel to which they are constitutionally entitled,
> attorneys providing defense services shall meet the following minimum
> professional qualifications:
>
> A.     Satisfy the minimum requirements for practicing law in
> Washington as determined by the Washington Supreme Court; and
>
> B.     Be familiar with the statutes, court rules, constitutional
> provisions, and case law relevant to their practice area; and
>
> C.     Be familiar with the Washington Rules of Professional
> Conduct; and
>
> D.     Be familiar with the Performance Guidelines for Criminal
> Defense Representation approved by the Washington State Bar
> Association; and
>
> E.     Be familiar with the consequences of a conviction or
> adjudication, including possible immigration consequences and the
> possibility of civil commitment proceedings based on a criminal
> conviction; and
>
> F.     Be familiar with mental health issues and be able to identify
> the need to obtain expert services; and
>
> G.     Complete seven hours of continuing legal education within
> each calendar year in courses relating to their public defense practice.

Also at issue is Standard 14.2 B.

B.    <u>Adult Felony Cases—Class A.</u>  Each attorney representing a defendant accused of a Class A felony as defined in RCW 9A.20.020 shall meet the following requirements:

    i.    The minimum requirements set forth in Section 1; and

    ii.    Either:

    a.    has served two years as a prosecutor; or

    b.    has served two years as a public defender; or two years in a private criminal practice; and

    iii. Has been trial counsel alone or with other counsel and handled a significant portion of the trial in three felony cases that have been submitted to a jury.

CrR 3.1(d)(4) states:

Before appointing a lawyer for an indigent person, or at the first appearance of the lawyer in the case, the court shall require the lawyer to certify to the court that he or she complies with the applicable Standards for Indigent Defense Services to be approved by the Supreme Court.

In turn, the SID provides a sample certification form. The version adopted in 2013 reads:

### CERTIFICATION OF COMPLIANCE

For criminal and juvenile offender cases, a signed Certification of Compliance with Applicable Standards must be filed by an appointed attorney by separate written certification on a quarterly basis in each court in which the attorney has been appointed as counsel.

The certification must be in substantially the following form:

8

No. 32507-5-III
*State v. Flores*

**SEPARATE CERTIFICATION FORM**

| [ ] SUPERIOR COURT [ ] JUVENILE DEPARTMENT<br>[ ] DISTRICT COURT [ ] MUNICIPAL COURT<br>FOR<br>[ ] CITY OF [ ] COUNTY OF _____,<br>STATE OF WASHINGTON | [ ] No.: _____<br>[ ] Administrative Filing |
| --- | --- |
| **CERTIFICATION BY:**<br>    [NAME], [WSBA#]<br>FOR THE:<br>[1ST, 2ND, 3RD, 4TH] CALENDAR QUARTER OF<br>[YEAR] | CERTIFICATION OF APPOINTED COUNSEL OF COMPLIANCE WITH STANDARDS REQUIRED BY CrR 3.1 / CrRLJ 3.1 / JuCR 9.2 |

The undersigned attorney hereby certifies:

1.    Approximately _____% of my total practice time is devoted to indigent defense cases.

2.    I am familiar with the applicable Standards adopted by the Supreme Court for attorneys appointed to represent indigent persons and that:

    a. **Basic Qualifications:** I meet the minimum basic professional qualifications in Standard 14.1.

    b. **Office:** I have access to an office that accommodates confidential meetings with clients, and I have a postal address and adequate telephone services to ensure prompt response to client contact, in compliance with Standard 5.2.

    c. **Investigators:** I have investigators available to me and will use investigative services as appropriate, in compliance with Standard 6.1.

    d. **Caseload:** I will comply with Standard 3.2 during representation of the defendant in my cases. [Effective October 1, 2013 for felony and juvenile offender caseloads; effective January 1, 2015 for misdemeanor caseloads: I should not accept a greater number of cases (or a proportional mix of different case types) than specified in Standard 3.4, prorated if the amount of time spent for indigent defense is less than full time, and taking into account the case counting and weighting system applicable in my jurisdiction.]

    e. **Case Specific Qualifications:** I am familiar with the specific case qualifications in Standard 14.2, Sections B-K and will not accept appointment in a case as lead counsel unless I meet the qualifications for that case. [Effective October 1, 2013]

_____       _____
Signature, WSBA#                        Date

9

The certifications filed by Mr. Raheem during this time period did not include subparagraph 2.e adopted in 2013, but instead used the certification form adopted in 2012 that included only the paragraphs listed in 2.a through 2.d. CP at 184-186.

Mr. Flores and amicus argue that Mr. Raheem was not acting as counsel under the Sixth Amendment to the United States Constitution because he did not satisfy the two year practice requirement before undertaking representation in this case. The authorities do not support their argument.

The Washington Supreme Court has the authority to promulgate rules that create procedural, but not substantive, rights. *State v. Templeton*, 148 Wn.2d 193, 212, 59 P.3d 632 (2002). Courts interpret court rules the same way they do statutes, using the tools of statutory construction. *State v. Hawkins*, 181 Wn.2d 170, 183, 332 P.3d 408 (2014). Questions of statutory interpretation are reviewed de novo. *State v. Bradshaw*, 152 Wn.2d 528, 531, 98 P.3d 1190 (2004). A court begins by looking at the plain meaning of the rule as expressed through the words themselves. *Tesoro Ref. & Mktg. Co. v. Dep't of Revenue*, 164 Wn.2d 310, 317, 190 P.3d 28 (2008). If the meaning is plain on its face, the court applies the plain meaning. *State v. Armendariz*, 160 Wn.2d 106, 110, 156 P.3d 201 (2007). Only if the language is ambiguous does the court look to aids of construction. *Id.* at 110-11. A provision is ambiguous if it is reasonably subject to multiple interpretations. *State v. Engel*, 166 Wn.2d 572, 579, 210 P.3d 1007 (2009). None of the provisions at issue here are ambiguous.

Whether it was error for Mr. Raheem to undertake the representation in this case is a question we cannot answer on this record. CrR 3.1(d)(4) requires the court to require certification by counsel either prior to appointment or when counsel appears in a case. Here, the court appointed MacDougall & Prince. No questions have been raised concerning their certifications. However, there was no certification by Mr. Raheem accompanying his appearance. Whether that is a violation of the rule or not is dependent on facts not in this record. The relationship between Okanogan County's indigent contract defender and appointees such as Mr. Raheem has not been explained. Some of the documents filed by Mr. Raheem were on his own pleading paper and others were on MacDougall & Prince pleading paper, making it appear that he was an employee of the firm or working under their direction. Similarly, whether MacDougall & Prince were expected to have a role in trial is another undeveloped fact.[3] The presence of Ms. MacDougall in the post-trial motions suggests that her firm may have retained the original appointment to represent Mr. Flores. Since their role in this case is an unknown factor, we simply cannot say that the court erred by not requiring Mr. Raheem to certify his compliance with the SID upon appearing in the case. Nonetheless, we recommend that any counsel appearing on behalf of an indigent criminal defendant certify in the

---

[3] Whether MacDougall & Prince assisted during the trial is yet another undeveloped fact. We therefore do not have to address the thorny question of whether assistance would require presence of an experienced attorney in the courtroom, or whether remote assistance is sufficient.

11

appearance or substitution form that he or she is qualified under Standard 14.2 to undertake the representation.[4]

The immediate problem here is that Mr. Raheem represented Mr. Flores when he did not have the two years of criminal practice experience required by Standard 14.2 B.[5] As noted, the contention is that Mr. Raheem was not "counsel" within the meaning of the Sixth Amendment guarantee, leaving no need for Mr. Flores to establish that he somehow was prejudiced by Mr. Raheem's representation. *Compare*, *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). This situation, however, is a far cry from the circumstances where a legal representative was deemed not to be counsel.

The primary Washington case is *City of Seattle v. Ratliff*, 100 Wn.2d 212, 667 P.2d 630 (1983). There a law student, working as a rule 9[6] intern, was ordered by the trial court to represent a defendant without the presence of his supervising attorney and without having any opportunity to prepare the case. *Id.* at 214. The Washington Supreme Court noted that "counsel" under the state and federal constitutions was a

---

[4] Another potential problem would be an amendment of existing charges to more serious ones that appointed counsel might not be qualified to handle. The trial court might want to consider the qualifications issue at the time of arraigning the defendant on the amended information.

[5] While the parties also argue about Mr. Raheem's compliance certificate, that document is of little consequence. The missing paragraph simply certifies that counsel was aware of the requirements of Standard 14.2, a fact not in question here, and certifies he will not accept future cases for which he is not qualified. It does not speak to whether or not counsel has done so in the past or in a current case.

[6] APR 9.

person "authorized by the courts to practice law." *Id.* at 217. To that end, it recognized both that attorneys and properly supervised rule 9 interns satisfied constitutional standards. *Id.* at 217-18. The convictions were reversed because the intern representing Mr. Ratliff was prevented from complying with the requirements of APR 9. *Id.* at 218-21. The intern did not attain the status of "counsel" in that circumstance and reversal was mandated without need to show prejudice. *Id.* at 221.

Mr. Flores argues that Mr. Raheem should be equated with the intern in *Ratliff* and not considered counsel under the Sixth Amendment, with the SID treated similarly to APR 9. Extending *Ratliff* in that manner would actually put this court in conflict with *Ratliff*. There the court expressly defined constitutional "counsel" as a person authorized to practice law. *Id.* at 217. There simply is no rule history or subsequent case law suggesting that the court intended the adoption of Standard 14.2 to redefine the constitutional meaning of "counsel."

Our court has at least twice considered criminal defense standards in recent years. The first instance was *State v. A.N.J.*, 168 Wn.2d 91, 225 P.3d 956 (2010). There the Washington Defender Standards, although not adopted by the court, were argued by the defendant on appeal. *Id.* at 109-10. Although acknowledging that "professional standards do not establish minimum Sixth Amendment standards," the court still found them "useful to courts in evaluating things like effective assistance of counsel." *Id.* at 110. The court then detailed the proper use of the standards:

No. 32507-5-III
*State v. Flores*

> While we do not adopt the WDA *Standards for Public Defense Services*, we hold they, and certainly the bar association's standards, may be considered with other evidence concerning the effective assistance of counsel.

*Id.*[7]

The issue of professional standards was revisited in *In re Pers. Restraint of Gomez*, 180 Wn.2d 337, 325 P.3d 142 (2014).[8] The court's analysis was blunt:

> Prevailing professional standards may serve as guides for determining what is reasonable but may not serve as a checklist for evaluating attorney performance.

*Id.* at 351 (citing *Strickland*, 466 U.S. at 688-689). In a footnote to that statement, the court quoted *A.N.J.*: "This court has previously concluded that 'professional standards are evidence of what should be done, no more.'" *Id.* at 351 n.3 (quoting 168 Wn.2d at 113).

In light of this history, we conclude that the adoption of the SID did not redefine what constitutes counsel under the Sixth Amendment. As in *Gomez* and *A.N.J.*, we hold that violation of the SID is *evidence* of ineffective assistance of counsel. It is not a categorical denial of counsel. To do anything else is to impose a higher standard of representation for indigent defendants than the Sixth Amendment requires for retained

---

[7] *A.N.J.* also held that a public defense contract that required the attorney to fund experts out of the fees paid counsel "may be considered as evidence of ineffective assistance of counsel." *Id.* at 112.

[8] Because the SID had not been adopted at the time of the *Gomez* trial, the court declined to apply them to the evaluation of counsel's experience. 180 Wn.2d at 351 n.2.

14

counsel.[9] Here, even if Mr. Raheem had committed no errors at all, or had achieved an

acquittal on all counts save some uncontested misdemeanor charge, Mr. Flores would still

receive a new trial due to noncompliance with Standard 14.2. Such an outcome places

the rule above that it is supposed to effectuate.

On the same day that it decided *Strickland*, the United States Supreme Court

issued *United States v. Cronic*, 466 U.S. 648, 104 S. Ct. 2039, 80 L. Ed. 2d 657 (1984).

There the court overturned a court of appeals standard that had focused on the attorney's

experience and case complexity rather than attorney performance. It noted:

> That conclusion is not undermined by the fact that respondent's
> lawyer was young, that his principal practice was in real estate, or that this
> was his first jury trial. Every experienced criminal defense attorney once
> tried his first criminal case. . . . The character of a particular lawyer's
> experience may shed light in an evaluation of his actual performance, but it
> does not justify a presumption of ineffectiveness in the absence of such an
> evaluation.

*Id.* at 665. We concur.

Although we reject the per se argument that Mr. Flores presents in this appeal, we

are troubled by what took place here. It appears that Mr. Raheem never called the

problem to the attention of the trial judge, the person charged with ensuring compliance

with the standards, even though he talked to two experienced attorneys at MacDougall &

---

[9] If Mr. Raheem had been retained rather than appointed, the sole issue would be whether he had satisfied his Sixth Amendment obligations under *Strickland*, just as it would be with any other criminal defense attorney. The SID address one group of attorneys, not all who perform criminal defense.

Prince about his noncompliance during the trial.[10] If alerted, the court could have taken efforts to assure compliance with the standards, whether that amounted to requiring an attorney to appear and assist with trial or declaring a mistrial. Keeping the trial judge in the dark and holding the argument for appeal is not acceptable.

No remedy is provided in the SID for violation of the standards set forth therein. This omission suggests that the remedy for violations of the standards rests with the disciplinary process. Whether there was a violation of the Rules of Professional Conduct is a question that only an appropriate investigation can answer. We do not opine on it.

Affirmed.

A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder having no precedential value shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.

We address next Mr. Flores' ineffective assistance of counsel claim, followed by a rather summary treatment of the remaining issues that present challenges to various portions of the judgment and sentence.

---

[10] Equally troubling is the indication that Mr. Raheem also spoke during trial with attorneys other than MacDougall & Prince seeking advice concerning his situation, but never presented the issue to the judge.

16

*Ineffective Assistance*

The standards governing adequacy of counsel under the Sixth Amendment have been settled since *Strickland*. The Sixth Amendment guaranty of the right to counsel requires that an attorney perform to the standards of the profession. Counsel's failure to live up to those standards will require a new trial when the client has been prejudiced by the failure. *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). In evaluating ineffectiveness claims, courts must be highly deferential to counsel's decisions. A strategic or tactical decision is not a basis for finding error. *Strickland*, 466 U.S. at 689-91. To prevail on a claim of ineffective assistance, the defendant must show both that his counsel erred and that the error was so significant, in light of the entire trial record, that it deprived him of a fair trial. *Id.* at 690-92.

Here, Mr. Flores argues that his counsel erred in several ways, including that he did not challenge leading questions and possible hearsay, did not object to testimony about the arrest of Jesse Flores, and failed to properly impeach Weitman. All but the last category can be answered summarily. While we do not agree that all of the questions cited in the brief were leading or called for hearsay responses, none of the challenged inquiries led to the admission of otherwise inadmissible evidence. A timely objection may have led to the rewording of a question or an answer, but it would have done nothing to prevent the ultimate admission of the testimony in question. This is a matter of style, not substance. No error in the admission of evidence has been demonstrated.

17

Similarly, counsel did not err by failing to object to the fact that Jesse Flores was found in possession of knives at the time of his arrest. The evidence was relevant—Johnathon was accused of acting in concert with Jesse, who was alleged to have stabbed Weitman. The fact that Jesse was arrested with knives similar to the one displayed during the assault was highly relevant evidence.

However, Mr. Raheem did err in his efforts to impeach Weitman. He failed to ask the witness about the prior statements. This was an elemental error. *See* ER 613(b). If asked, Weitman might have agreed that he made the contrary statements and obviated the need to call any impeachment witnesses. This was a failure to perform to the standards of the profession. *State v. Horton*, 116 Wn. App. 909, 916-17, 68 P.3d 1145 (2003).[11]

The remaining *Strickland* question is whether this error prejudiced Mr. Flores so significantly that he was denied a fair trial. We conclude that the prejudice was not that severe. The defense investigator was only going to be asked if Weitman had told him he believed McCorkle still was present when the knife was first displayed. This point was of little moment. Michaela Flores, the defendant's wife, was expected to testify that Weitman had denied that Johnathon had done anything. Although that information would have some value to impeach Weitman, he had already explained to the jury that he

---

[11] As observed in *Cronic*, Mr. Raheem's lack of experience is a likely source of this error. The SID violation supports the conclusion that counsel made a mistake due to lack of knowledge.

18

had told Michaela Flores he would not testify in order to "put her off" after she had asked him to not testify. Report of Proceedings at 204. In other words, Weitman told Michaela Flores, already a suspect witness due to her marriage to the defendant and her persistent efforts to talk to the victim, whatever she wanted to hear. While undoubtedly the information would have been useful for the defense, it was not so significant that we believe the verdict would have changed. Weitman had already been impeached with other minor inconsistencies in his testimony and his prior attempted vehicle theft conviction. The testimony of Michaela Flores would have added little.

We conclude that although Mr. Flores has demonstrated that his counsel erred, he has not demonstrated that the error rendered his trial unfair. Although deficient, counsel's performance was not ineffective.

*Sentencing Issues*

Mr. Flores also raises a number of claims relating to the judgment and sentence form. All of these claims have been the subject of numerous recent opinions and are treated summarily here.

He first contends that the trial court erred by failing to conduct the necessary statutory inquiry before imposing discretionary legal financial obligations (LFOs). *See State v. Blazina*, 182 Wn.2d 827, 344 P.3d 680 (2015). However, the discretionary LFOs

19

amount to only $60.40. The other $800 in LFOs imposed by the courts are mandatory

assessments.[12] We decline to consider this claim. *Id.* at 833-34.

Mr. Flores argues that his due process and equal protection rights were violated

when the court imposed the DNA collection fee, and that he should not have been

ordered to provide an additional DNA sample. As to the claim that his due process rights

were violated by imposition of the DNA collection fee, Mr. Flores can point to no facts in

the record suggesting he cannot pay the $100 fee. This alleged error therefore is not

manifest and we decline to review it. RAP 2.5(a)(3); *State v. Lewis*, 194 Wn. App. 709,

715, 379 P.3d 129 (2016); *State v. Shelton*, 194 Wn. App. 660, 674-75, 378 P.3d 230

(2016); *State v. Stoddard*, 192 Wn. App. 222, 366 P.3d 474 (2016).

The equal protection argument fares no better. Although it states a reviewable

constitutional claim, it does not have any merit, in large part because there is no factual

basis to establish that anyone was negatively impacted by the classification. *Lewis*, 194

Wn. App. at 715-20; *State v. Johnson*, 194 Wn. App. 304, 374 P.3d 1206 (2016); *State v.*

*Mathers*, 193 Wn. App. 913, 376 P.3d 1163 (2016).

Mr. Flores next contends that he should not have to provide an additional DNA

sample. However, the record does not contain any evidence indicating whether he has

---

[12] We note that these sums total $860.40, but the judgment and sentence lists the tally as $1,110.50. The trial court is directed to revise the judgment to reflect the proper amount. The defendant need not be present.

No. 32507-5-III
*State v. Flores*

done so in the past. Accordingly, there is no basis for relief. *Lewis*, 194 Wn. App. at

720-21.

The judgment and sentence is affirmed.

_____
Korsmo, J.

WE CONCUR:

_____
Fearing, C.J.

_____
Lawrence-Berrey, J.

21